# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-61030-CIV-ZLOCH/ROSENBAUM

MARIE LOUIS,

       Petitioner,

v.

UNITED STATES OF AMERICA,

       Respondent.

_____ /

## REPORT AND RECOMMENDATION

This matter is before the Court upon Petitioner Marie Louis's Petition for Writ of Error Coram Nobis to Vacate or Set Aside a Conviction. [D.E. 1]. The Honorable William J. Zloch referred Petitioner's Motion and the case to me for further proceedings and a report and recommendation concerning disposition of all matters in the case. [D.E. 8]. I have carefully considered the Petition, the Government's Response [D.E. 9] and the Appendix attached thereto, Petitioner's Reply [D.E. 13], Petitioner's Post-Hearing Memorandum of Law [D.E. 21] and supporting exhibits [D.E. 23], the Government's Response to Petitioner's Post-Hearing Memorandum [D.E. 27], and the Court file. I also heard testimony and oral argument at a hearing held on December 16, 2010, and am otherwise duly informed in the premises. Based on my review, I recommend denying the Petition for Writ of Error Coram Nobis.

## I.   BACKGROUND

### A.  The Underlying Case and the Road to this Petition

Petitioner Marie Louis ("Louis" or "Petitioner") is a Haitian citizen who, at the time of her

arrest, was in the United States legally and possessed a green card.  Louis arrived in the United States

as a young girl, sometime between the ages of five and eight years old.  In 1989, Louis was arrested

along with her two sisters, Janet and Sandra Tulley, for possession with intent to distribute cocaine.

On June 10, 1989, Louis and her sisters were indicted for knowingly and intentionally possessing

cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  *See* Pl.'s

Ex. 1.  All three sisters were prosecuted as co-defendants in the case styled *United States v. Tulley,*

Case No. 89-06122-Cr-Roettger (S.D. Fla.).[1]  Throughout her criminal prosecution, Louis was

represented by then-Assistant Federal Public Defender Leon Watts ("Watts" or the "AFPD").

On August 9, 1989, Watts filed a Motion for Disclosure of Confidential Informant and for

the Production of Confidential Informant for Interview.  The Motion indicated that the Government's

case was based upon information obtained from a confidential informant who stated that co-

defendant Janet Tulley would be transporting a quantity of cocaine while traveling in a rental car

from Fort Lauderdale, Florida, to Washington, D.C.  On the morning of June 10, 1989, the Motion

continued, Louis and co-defendants Janet and Sandra Tulley placed luggage into the rental car, and

DEA agents later stopped the vehicle, searched the vehicle and the women, and seized approximately

one kilogram of cocaine from each of the women.[2]  The Motion sought the disclosure of the identity

---

[1]According to the case file, upon arrest, Louis's sister and co-defendant Janet Tulley advised Drug Enforcement Administration ("DEA") agents that she and her sisters (including Louis) were offered $600 per person to transport multiple kilograms of cocaine from Miami, Florida, to New York and the Washington, D.C., area.  Subsequent to Louis's arrest, the drugs found in Louis's undergarments tested positive for cocaine.

[2]An affidavit signed by DEA Special Agent Coleman B. Ramsey states that Janet Tulley consented to a search of the vehicle and that during the search of the rental car, agents recovered approximately two kilograms of cocaine in the luggage of Janet Tulley and one kilogram of cocaine on the persons of Sandra Tulley and Marie Louis from the women's undergarments.  The Government's Response to a Motion to Suppress [D.E. 35 in underlying criminal case] indicates

of the confidential informant and production of the informant for an interview to determine whether the informant was reliable.  Magistrate Judge Snow granted the Motion on August 15, 1989.  *See* Pl.'s Ex. 1.

On September 27, 1989, Watts filed a Motion to Suppress arguing that the stop of the vehicle that Louis and her sisters traveled in amounted to a "seizure" and that it was made without reasonable suspicion or probable cause.  *See* Pl.'s Exs 1.  Watts further objected in the Motion to Suppress that the stop and subsequent search of the vehicle and individuals traveling in the vehicle was conducted without a warrant.  The case file does not indicate whether the Motion to Suppress was ever ruled upon by the Court.

On July 24, 1990, Louis entered a plea of guilty in the underlying criminal case to a single count of possession with intent to distribute at least 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1).  On the same day, the Court set sentencing for September 27, 1990.  At her plea and sentencing, Louis continued to be represented by Watts.  Although the record does not contain a copy of the transcript of Louis's change-of-plea hearing, a transcript of co-defendant Janet Tulley's plea colloquy appears in the file.  According to the parties, the pleas of Louis and Tulley were entered contemporaneously.  Despite the lack of a transcript of Louis's change-of-plea hearing, a copy of Louis's plea agreement does appear in the case file.  Inspection of Louis's plea agreement reveals that the agreement does not contain any mention of immigration or deportation consequences.

On September 5, 1990, the Pre-Sentence Investigation Report ("PSI") became available for the parties to review.  *See* D.E. 23 at 3.  Among other information, the PSI reported personal

---

that after being advised of her *Miranda* rights, Louis admitted that she was carrying cocaine under her clothing.  *See* Pl.'s Ex. 1.

information regarding Louis, including that she was born in Haiti and had been a legal resident alien in the United States since she was five years old.  *See id.* at ¶31.  In addition, the PSI set forth information concerning the names, occupations, and locations of Louis's immediate family members. *See id.* at ¶¶ 32-33.

On September 20, 1990, in connection with Louis's impending sentencing, attorney Watts filed a Motion for Judicial Recommendation Against Deportation ("JRAD").  *See* D.E. 9-1.  The JRAD Motion contained precisely the same personal information reported in the PSI and cited above.  *Id.*  In addition, however, the JRAD indicated that Louis intended to further her education and develop her vocational skills during her incarceration so that she could become gainfully employed after she completed her prison term.  *See* D.E. 9-1 at 16.  This information is not included in the PSI.  Finally, in the JRAD, Watts urged the Court to "exercise its power to recommend to the Immigration and Naturalization Service [("INS")] that [Louis] not be deported or excluded."  *Id.* at 17.  The record does not indicate whether the JRAD motion was ever ruled upon by the Court. The record, however, does show a response by the State of Florida stating that it "defers to the position of the United States Attorney." *See* D.E. 58.

On September 27, 1990, Judge Roettger sentenced Louis to sixty-three months in prison and four years of supervised release.  Judge Roettger also recommended that Louis serve her sentence at the Danbury facility.  Louis began her prison sentence in 1990.

On September 28, 1992, during Louis's prison term, INS ordered that Louis be deported.  *See* D.E. 9-1 at 29.  Approximately eleven weeks later, on December 14, 1992, Louis filed a *pro se* Motion for Modification of Sentence pursuant to 18 U.S.C. § 3582(c)(2).  *See* D.E. 24-1 at 20. In her Motion for Modification of Sentence, Louis acknowledged that she had entered a plea of

guilty in September of 1990 and was sentenced by the Court to a term of 63 months' imprisonment.[3] The Motion for Modification of Sentence, however, sought an additional one-point reduction in the Sentencing Guidelines offense level based upon Louis's cooperation.  More specifically, the Motion for Modification of Sentence averred that Louis had accepted responsibility for her offense, timely provided information concerning her own involvement in the offense, and saved the Government the time and expense of preparing for trial.  Consequently, the Motion concluded, Louis was entitled to a one-point decrease under Section 3E1.1 of the Sentencing Guidelines.  The Motion did not raise any issues relating to Louis's order of deportation, nor did Louis indicate at that time that she wished to withdraw her guilty plea.  Louis was removed from the United States at the Port of Miami on March 8, 1994.  *See* D.E. 9-1 at 30.

Louis did not directly appeal her 1990 conviction.  Instead, Louis filed this Petition for Writ of Error Coram Nobis to Vacate or Set Aside A Conviction (the "Coram Nobis Petition" or "Petition") on June 20, 2010, nearly twenty years after Judge Roettger announced Louis's sentence based upon her guilty plea. *See* D.E. 1.

In the Coram Nobis Petition now before the Court, Louis contends for the first time that she was denied effective assistance of counsel under the Sixth Amendment of the Constitution because Watts never advised her regarding the mandatory immigration consequences of her guilty plea prior to either her change-of-plea hearing or the sentencing hearing.  Likewise, Louis claims that Judge Roettger did not advise her of the immigration consequences of her guilty plea at any time.  Louis further asserts that Watts never informed her that he intended to file or did, in fact, file the JRAD,

---

[3]Louis had received only a two-point offense point reduction for acceptance of responsibility at the time of her sentencing.

5

requesting that the Court recommend against deportation.  Similarly, according to Louis, Watts never advised her of the outcome of the JRAD.  Louis relies on the recent Supreme Court opinion in *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473 (2010), in support of her Petition.

Had she been advised of the immigration consequences of entering a guilty plea (*i.e.*, deportation), Louis argues, she would not have entered the plea and, instead, would have risked going to trial.  Louis emphasizes that she was sentenced to 63 months in prison and that her Guidelines level was a 26 with a range of imprisonment of 63-78 months.  According to Louis, had she proceeded to trial and been convicted, she would have had a Guidelines level of 28 with a range of imprisonment of 70-87 months.  Consequently, Louis contends that had she gone to trial, her exposure was only a relatively small amount of additional imprisonment.  If she were acquitted, she would have escaped the prison term and would not have been subject to automatic deportation.  Based on these facts, Louis argues that it would have been rational for her to reject the plea bargain in this case if she had been advised of the immigration consequences.

## B.  The Evidentiary Hearing

On December 16, 2010, the Court held an evidentiary hearing on the allegations set forth in Louis's Coram Nobis Petition.  During the hearing, Louis was present[4] and testified that Watts never advised her of the immigration consequences of entering a guilty plea.  Louis admitted on cross-examination, however, that Watts had explained the plea agreement to her before she was sentenced by Judge Roettger.  Louis also testified that Watts spoke to her about the likelihood of conviction,

---

[4]It is not clear pursuant to what authority, if any, Louis was present in the United States for the hearing.  The Assistant United States Attorney indicated that Louis had not received permission from the Attorney General or his successor in interest to apply for reentry to the United States.

6

the strength of the Government's case, and the witnesses likely to be called at trial.  Additionally, Louis stated that Watts reviewed the Sentencing Guidelines with her and went over a "document with her history on it."  Yet, according to Louis, Watts never advised her about the immigration consequences of her guilty plea or the likelihood that she would be deported to Haiti despite knowing that Louis was a Haitian citizen.

Louis also denied knowing that Watts intended to file, or did in fact file the JRAD Motion, until recently.  According to Louis, it was only after she was serving her prison term that she learned that she would be deported.  In this respect, Louis explained that someone from Immigration went to the prison and advised her that she would be deported.  Despite learning about the impending deportation and discussing it with her family, Louis testified that she did not take any steps to hire a lawyer to vacate the guilty plea because she lacked the money to hire counsel.  Nevertheless, Louis confirmed that she had filed her *pro se* Motion in December of 1992 and admitted that the filing did not indicate a desire to revoke her plea.

Watts also testified before the Court during the December 16, 2010, evidentiary hearing. During his testimony, Watts contradicted Louis's version of events and advised the Court that he had, in fact, spoken with Louis about the immigration consequences of her guilty plea prior to the entry of the plea.  Watts explained that his file notes indicated that Louis was not a U.S. citizen and that the Immigration and Naturalization Service ("INS") had a possible Immigration hold on her. Watts testified that he remembered filing the JRAD, had discussed the JRAD Motion with Louis, and, in fact, had obtained the facts set forth in the JRAD Motion from Louis.  When asked whether he had spoken to Louis about the consequences of a guilty plea, Watts stated that he told Louis that she could be deported if she pled guilty.  Watts further opined that Louis, nonetheless, voluntarily

7

chose to enter a plea of guilty voluntarily.  With respect to the weight of the evidence against Louis, Watts stated that he felt that the case was indefensible because Louis and another co-defendant were found with cocaine on their person.

Nichon Mahendran, a private attorney specializing in immigration matters, also testified that he met with Louis in October of 2008 and advised her that he could not do anything to help her with respect to her immigration status.  According to Mahendran, Louis returned to see him in early 2010, at which time he advised her that because of the earthquake in Haiti, she might be eligible for temporary relief.  Mahendran further testified that on March 18, 2010, he reviewed Louis's criminal record and determined that nothing could be done to assist her.  Subsequently, however, and in light of the *Padilla* case, Mahendran advised Louis that relief might be available.  He then referred Louis to criminal attorney Stephen Rysman.  On cross-examination, Mahendran testified that he was not counsel for Louis at the time of the entry of her guilty plea and that he did not know whether her counsel had advised her regarding her immigration status.

After hearing testimony during the December 16, 2010, hearing and observing the witnesses during their testimony, I find Louis's testimony not credible and Watt's testimony credible in the material respects.[5]  Accordingly, I find that Watts did counsel Louis that deportation was a possible immigration consequence of entering a guilty plea by informing her that she could be deported as a result of entering the guilty plea.  In making this credibility determination, I have taken into

---

[5]Although Watts may have made some statements that may not have been entirely accurate, based on Watts's demeanor and the content of his testimony, the Court concludes that any misstatements in Watts's testimony are attributable to the passing of twenty years between his representation of Petitioner and the hearing, not to any intention to deceive.  As Watts explained, he effectively reconstructed his recollection of events, based on the materials in the record, and he relied in his testimony primarily on his knowledge of his routine manner of practice in every case he handled as an AFPD for more than 18 years.

consideration the witnesses' demeanor as well as certain discrepancies in testimony.

First, Louis's demeanor while she was on the stand and the content of her testimony indicate that Louis was less than credible.  Louis did not appear forthright when answering questions. Although Louis agreed that Watts had spoken with her about virtually every other aspect of the case (*i.e.*, the strength of the Government's case, the likely witnesses to be called, and variables relating to sentencing), she denied that Watts had talked with her about immigration consequences of the plea.  Likewise, Louis appeared aware that Watts had filed the Motion to Disclose the Confidential Informant and the Motion to Suppress on her behalf, but nonetheless claimed that she was not aware that Watts had filed the JRAD Motion.

Moreover, with respect to the JRAD Motion itself, Louis contended during the evidentiary hearing that certain items in the JRAD Motion were incorrect, but her testimony attempting to correct those aspects of the JRAD lacked credibility.  When Louis first took the stand, she testified that she came to the United States when she was six years old.  However, when Louis was subsequently re-called to the stand, she testified that she was seven or eight years old when she came to the United States.  Both of these answers conflict with the information in the PSI and the JRAD Motion, which indicate that Louis was five years old when she came to the United States.  Similarly, Watts's intake notes of his initial contact with Louis state that she was 20 years old at the time and that she had been in the United States for fifteen years, thus making her approximately five years old at the time that she entered the country.  D.E. 23 at 12-13.

Adding to the inconsistencies noted above, Louis further testified during the December 16, 2010, hearing that at the time that she pled guilty in 1990, she believed that she was nineteen years old.  This also differs from what Watts's intake notes from 1989 reflect.  Beyond that, Louis claimed

that in 1996, she learned that the man whom she previously thought to be her father was not, in fact, her father, but her mother did not want this man to know that Louis was not his child. Consequently, according to Louis, Louis's mother purposely wrongly advised Louis of her date of birth, and Louis was actually only seventeen years old at the time of her guilty plea.[6] Although Louis claimed to have seen an official document indicating her true birth date, Louis did not bring it with her to Court or otherwise produce it.

Thus, setting aside the lack of credibility in Louis's story regarding her new birth date and even accepting Louis's story at face value for purposes of this discussion, that means that she was actually two years younger than she believed when she originally came to the United States. In other words, as of Louis's 1989 statement to Watts regarding Louis's age at the time she entered the United States, Louis was actually three years old, not five years old. Presumably, Louis factored the alleged two-year misstatement regarding her birth date into her testimony during the December 16, 2010, hearing, at which she testified at different times in the proceeding that she was six, seven, and eight years old when she first arrived in the United States, meaning that she once believed that she was actually eight, nine, or ten years old when she originally came to the United States. Thus, as it pertains to Louis's testimony regarding her age when she first arrived in the United States, a seven-year swing exists. Nor has Louis offered any explanation for these significant variations.

Louis also was untruthful when she testified that at the time that she filed her *pro se* Motion for Reduction in Sentence, she did not know that she was going to be deported. First, Louis's evidentiary hearing testimony can be construed to provide evidence that she learned in 1990 that she

---

[6]During the hearing, counsel for Louis clarified that Louis was not seeking relief on the basis that she allegedly was under the age of 18 at the time that she pled guilty, although it is unclear what other relevance such a point might have had.

would be deported.  *See* D.E. 28 at 30:11-:25.  Second, even if Louis's testimony is not so interpreted, Louis testified that someone from the Government came and visited her at the jail to advise her that she would be deported.  Only one visit to Louis by a representative of INS appears on Louis's Record of Deportable Alien, though.  That visit occurred on May 8, 1991, and the Record of Deportable Alien confirms Louis's recollection that the INS representative discussed Louis's deportable status with her at that time.  *See* D.E. 9-1 at 33.  Indeed, INS issued the Warrant of Deportation for Louis on September 28, 1992.  *See id.* at 29.  Louis filed her *pro se* motion in December of 1992.  Accordingly, in contrast to her testimony, Louis knew that she was going to be deported prior to filing her *pro se* motion.

Finally, later in her testimony, Louis stated that she "was under the assumption that she would not be deported."  In her words, she did know that deportation was "mandatory."  This testimony suggests that Watts did speak with Louis about the immigration consequences because if he had not, Louis would not have had any assumptions with respect to deportation.  Quite simply, if Watts had not spoken with her, Louis would not have had any belief, either way, whether deportation was mandatory or not.  It is also not inconsequential that Louis appears to have been in the country illegally in 2008, when she met with her immigration lawyer, Nichon Mahendran.  She further did not provide any explanation indicating that she was in the country legally when she testified before the Court at the December 16, 2010, hearing.  These circumstances suggest that Louis has less than a complete respect and appreciation for the law, and, by implication, for the significance of her oath.

For all of these reasons, I find Louis not to be credible in her testimony.  This credibility inquiry, however, does not dispose of this case.

## II.  ANALYSIS

As noted above, Louis claims that her conviction should be vacated because she did not receive effective assistance of counsel, in violation of the Sixth Amendment.  D.E. 1 at 1-2.  More specifically, Louis  asserts that her counsel performed deficiently when he failed to advise her that her conviction for drug distribution made her subject to automatic deportation.  *Id.*  Louis did not directly appeal her conviction or sentence and now raises her arguments through a petition for writ of error coram nobis almost twenty years after her 1990 conviction.  In her Petition, Louis contends that her claim relies on a new rule of law set forth in *Padilla v. Kentucky,* __ U.S. __, 130 S. Ct. 1473 (2010).

This Court has the authority to issue a writ of error coram nobis under the All Writs Act, 28 U.S.C. § 1651(a).  *U.S. v. Mills*, 221 F.3d 1201, 1203 (11th Cir. 2000), *cert. denied,* 531 U.S. 1144 (2001); *Jackson v. United States*, 375 F. App'x 958, 959 (11th Cir. 2010).  The All Writs Act grants federal courts the power to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  *U.S. v. Chavarry*, 376 F. App'x 928, 929 (11th Cir. 2010) (citation and internal quotations omitted).  A writ of error coram nobis is a remedy of last resort and is "available to vacate a conviction when the petitioner has served his sentence and is no longer in custody, as is required for post-conviction relief under 28 U.S.C. § 2255."[7]  *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002).  As explained by the Supreme Court in *United States v. Morgan*, coram nobis relief is available when the petitioner is out of

---

[7]Adverse collateral consequences of a conviction, such as deportation, do not render an individual "in custody."  *U.S. v. Esogbue*, 357 F.3d 532, 534 (5th Cir. 2004) (citing *Maleng v. Cook*, 490 U.S. 488, 492 (1989), and *United States v. Castro*, 26 F.3d 557, 559 n. 3, 561 n. 8 (5th Cir. 1994)).

custody because "the results of the conviction may persist.  Subsequent convictions may carry heavier penalties, civil rights may be affected."  346 U.S. 502, 512-13 (1954).

A writ of error coram nobis is an "extraordinary remedy of last resort available only in compelling circumstances where necessary to achieve justice."  *United States v. Mills*, 221 F.3d 1201, 1203 (11th Cir. 2000), *cert. denied*, 531 U.S. 1144 (2001); *Jackson*, 375 F. App'x at 959;  *U.S. v. Obasohan*, 318 F. App'x 798 (11th Cir. 2009).  A petition for coram nobis is limited to review of errors "of the most fundamental character."  *United States v. Morgan*, 346 U.S. 502, 511 (1954); *Mills*, 221 F.3d at 1203.  Indeed, a writ of coram nobis is a highly unusual remedy, available only to correct the most serious injustices in a small class of cases where no other conventional remedy is available.  *U.S. v. Riedl*, 496 F.3d 1003 (9th Cir. 2007), *cert. denied*, 552 U.S. 1188 (2008).

Courts do not frequently grant petitions for writs of error coram nobis.  As explained by the Eleventh Circuit in *United States v. Peter*,

> Routine grant of coram nobis relief, however, would undermine the finality of criminal convictions, a finality achieved in most federal cases either at the time a conviction is affirmed on appeal or at the expiration of the period during which an appeal remains available. Due regard for the finality of criminal convictions counsels special restraint in the review of collateral attacks on convictions entered pursuant to guilty pleas.  Failure to appeal such convictions waives challenges based on many types of error in the proceedings which culminated in entry of the plea.

310 F.3d at 712 (citing *Bousley v. United States*, 523 U.S. 614, 621 (1998) and *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979)).  Thus, the Supreme Court has "'strictly limited the circumstances under which a guilty plea may be attacked on collateral review.'"  *Id.*  (quoting *Bousley*, 523 U.S. at 621); *See also Obasohan*, 318 F. App'x at 800 ("[T]he concern with finality served by the limitation on collateral attack has special force with respect to convictions based on

guilty pleas.") (internal citation omitted).  On the other hand, "the law recognizes that there must be a vehicle to correct errors 'of the most fundamental character; that is, such as rendered the proceeding itself irregular and invalid.'" *Id.* (quoting *Morgan*, 246 U.S. at 509 n.15; other internal citations omitted).

The bar to obtain relief under a writ of error coram nobis is high.  *Alikhani v. United States*, 200 F.3d 732, 734 (11th Cir. 2000), *cert. denied*, 531 U.S. 929 (2000).  A petitioner may be granted relief only when (1) "there *is and was* no other available avenue of relief" and (2) "only when the error involves a matter of fact of the most fundamental character which has not been put in issue or passed upon and which renders the proceeding itself irregular and invalid."  *Alikhani*, 200 F.3d at 734 (emphasis added) (quoting *Moody v. United States*, 874 F.2d 1575, 1576-77 (11th Cir. 1989)); *Chavarry*, 376 F. App'x at 929; *Obasohan*, 318 F. App'x at 800.  Furthermore, a district court may consider a coram nobis petition "only where no other remedy is available and the petitioner presents sound reasons for failing to seek relief earlier."  *Mills*, 221 F.3d at 1204; *Alikhani*, 200 F.3d at 734; *Jackson*, 375 F. App'x at 959; *Obasohan*, 318 F. App'x at 800; *see Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("'[I]t is difficult to conceive of a situation in a federal criminal case today where [a writ of coram nobis] would be necessary or appropriate.'") (quoting *United States v. Smith*, 331 U.S. 469, 475 n. 4 (1947)).  Put simply, the writ of coram nobis acts only "as an assurance that deserved relief will not be denied as a result of the technical limitations of other post-conviction remedies."  *Id.*

Both parties appear to concede that the appropriate avenue for the relief sought by Louis is the petition for writ of error coram nobis because Louis is no longer in custody.  After careful consideration, I recommend that the Court deny Louis's Petition because she has not shown that no

14

other avenues of relief were available to her and because she has not presented sound reasons for failing to seek relief earlier. Additionally, Louis cannot show that she suffered the requisite prejudice necessary to establish an ineffective-assistance-of-counsel claim.

### A. Timeliness of Challenge to Conviction and Other Available Relief

Because Louis has not showed justifiable reasons why she delayed seeking relief, her petition should be denied. As noted by the Second Circuit in *Yong Wong Park v. United States*, 222 F. App'x 82, 83 (2d Cir. 2007), a writ of error coram nobis is not subject to a specific statute of limitations. *See also Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir 1994). Instead, the petitioner must show "sound reasons" for failing to seek relief earlier. The "critical inquiry is . . . whether the petitioner is able to show justifiable reasons for the delay." *Park*, 222 F. App'x at 83 (quoting *Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996)); *Mills*, 221 F.3d at 1204 (citing *Morgan*, 346 U.S. at 512); *Jackson*, 375 F. App'x at 959; *See also Telink*, 24 F.3d at 45 (no statute of limitations on filing petition for writ of coram nobis; instead, the petitioner must show sound reasons for not attacking conviction earlier).

No exact timeliness rule has been established with respect to coram nobis petitions. As a result, courts, in their discretion, decide the issue on a case-by-case basis. *Foont*, 93 F.3d at 79. Indeed, very few courts have addressed what constitutes "sound" reasons for delay, but courts have denied petitions for writs of error coram nobis when a petitioner "provides no explanation or appears to be abusing the writ and when the respondent demonstrates prejudice as a result of the delay." *United States v. Hubenig*, 2010 WL 2650625 (E.D. Cal. 2010). In this regard, courts evaluating a petition for writ of error coram nobis may deny the petition "if the petitioner inexcusably delays in asserting his claims and the government is prejudiced by the delay." *Telink*, 24 F.3d at 47. "In

15

making a determination of prejudice, the effect of the delay on both the government's ability to respond to the petition and the government's ability to mount a retrial are relevant." *Id.* at 48.

Additionally, "if the district court decides that there was not sufficient justification for [the petitioner's] failure to seek relief at an earlier time, the writ is unavailable and [the] petition for coram nobis should be dismissed." *Nicks v. United States*, 955 F.2d 161, 167-68 (2d Cir. 1992). Ultimately the petitioner bears the burden to justify her delay in seeking earlier relief.

Here, Louis filed her petition approximately twenty years after she pled guilty to one count of possession with intent to distribute cocaine, in violation 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After considering the testimony presented at the December 16, 2010, hearing, and reviewing the arguments contained in the parties' briefs and made by counsel during the hearing, I find that Louis has not shown sound reasons for failing to seek relief earlier. Notably, Louis admitted that she found out about her impending deportation while she served her sentence. And the record plainly provides evidence of the latest date that this could have occurred: May 8, 1991, when INS visited Louis in jail regarding her deportation. Even assuming that her counsel did not advise her of the immigration consequences of her guilty plea, Louis knew by May of 1991 that she would be deported upon completion of her sentence as a result of her conviction.

At this point, it was apparent that Louis's plea had immigration consequences. Accordingly, at this time, Louis should have realized her counsel's alleged ineffectiveness in failing to advise her of the consequences of her guilty plea and sought relief. Instead, Louis took precisely the opposite step and filed a *pro se* Motion for Modification of Sentence pursuant to 18 U.S.C. § 3582(c)(2) in which she reaffirmed her guilt and her guilty plea. Indeed, Louis sought to benefit further from her guilty plea, requesting an additional one-point reduction in the Sentencing Guidelines range based

16

upon Louis's acceptance of responsibility and alleged cooperation.  Nor did Louis ever appeal her

conviction or otherwise notify the Court that her plea was unknowing due to her counsel's alleged

failure to advise her about deportation.  Not until now – approximately twenty years later – has Louis

sought relief for the first time.

The facts of this case are similar to those set forth in *Tran v. United States*, 45 F. Supp. 2d

157 (D.P.R. 1999), where the court denied coram nobis relief.  In *Tran,* Tran, the petitioner, entered

the United States after escaping from Vietnam in 1979.  *Id.* at 159.  In 1984 Tran pled guilty to one

count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841.  *Id.*  Tran

was later sentenced to four years' imprisonment followed by three years of special parole.  *Id.*  In

February 1985, while serving his sentence, Tran received an Order to Show Cause and Warrant of

Arrest of Alien in Deportation Hearing.  *Id.*  Tran completed his sentence in April of 1991 and,

subsequently, in 1995, Tran filed a citizenship application in which he disclosed his prior conviction.

*Id*.  In December of 1995, Tran learned that a final deportation order had been entered by an

immigration judge in 1987.  *Id.*  A year and a half after learning about the final deportation order,

Tran filed his petition for writ of error coram nobis.  *Id.*

In his petition Tran sought to have his conviction vacated based upon fundamental error,

asserting that before Tran pled guilty, his counsel had informed him that the United States was not

deporting people to Vietnam.  *Id.*  Tran claimed that the alleged misinformation constituted

ineffective assistance of counsel because had he known that he could face deportation as a result of

pleading guilty, he would not have pled guilty and instead would have gone to trial.  *Id.*  As a result,

Tran argued, his guilty plea was not voluntary and, therefore, should be set aside.  *Id.*

In considering Tran's petition, the court first noted that the writ of coram nobis has been

17

described by courts as an "'unusual legal animal that courts will use to set aside a criminal judgment of conviction only 'under circumstances compelling such action to achieve justice.'" *Id.* at 160 (quoting *Hager v. United States*, 993 F.2d 4, 5 (1ˢᵗ Cir. 1993) (citing *Morgan*, 346 U.S. at 511)). The court further described the writ as available for the courts "'to cure the freakish case rather than a readily available remedy to cure the mundane' because 'vacation of a longstanding judgment [should] be a jealously guarded exception' rather than the general rule." *Id.* (quoting *United States v. Holder*, 936 F.2d 1, 6 (1ˢᵗ Cir. 1991) (internal citation omitted)). Within this framework, the court concluded that Tran's petition should be denied because the case fell short of the category of a "freakish" case that warrants setting aside a long-standing judgment. *Id.* at 161.

More specifically, the court determined that the writ of coram nobis was not available to Tran because he had other legal mechanisms available to address his situation. *Id.* In this respect, the court emphasized that when Tran received the Order to Show Cause regarding deportation, Tran became aware that the information allegedly provided to him by his counsel regarding his unlikely deportation was incorrect. *Id.* At that time, Tran was still in custody serving his criminal sentence and, thus, the court found that he could have filed a motion pursuant to 28 U.S.C. § 2255 to attack his conviction under the theory set forth in his coram nobis petition. *Id.* Additionally, the court reasoned that even assuming that Tran had not been notified about the deportation hearing date, when he found out in December of 1995 about the entry of the final deportation order, he should have sought to re-open the deportation proceedings, claiming a violation of his due process rights, and should have tried to have the order vacated. *Id.* Finally, the court noted that Tran could have requested a waiver of excludability pursuant to Section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c). Finding no indication in the record that Tran had taken advantage of any

18

of these available mechanisms, however, the court declined to issue the writ of coram nobis.  *Id.*

In reaching this conclusion, the court emphasized that Tran had waited a year and a half after learning about the final deportation order before filing his petition for writ of error coram nobis.  *Id.* The court found that the lengthy delay militated against Tran.  *Id.*  Ultimately, the court held that Tran had not provided a reasonable explanation as to why he did not seek earlier relief from either his criminal conviction or the deportation order.  *Id.* at 161-162.

The facts of Louis's case set forth an even more striking basis for finding that the writ of coram nobis is not available to Louis.  Like Tran, Louis had been in the United States for a while prior to her arrest.  Interestingly, Louis was arrested on the very same charges as Tran – possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841.  Also like Tran, Louis claims that her counsel did not advise her regarding the immigration consequences of her guilty plea but admits that she found out about the deportation proceedings while in custody.  Despite this knowledge, Louis, like Tran, did not file a petition pursuant to 28 U.S.C. § 2255 attacking her conviction.[8]  Nor does the record reflect that Louis took any action to claim a violation of her rights during the deportation proceedings.  And, although Louis emphasized during the December 16, 2010, hearing the dangers associated with returning to and living in Haiti, she has never sought asylum here.

Finally, whereas the *Tran* Court found Tran's year-and-one-half delay in seeking coram nobis relief to be untimely, here, Louis did not petition the Court for any sort of relief until, at best,

---

[8]Louis also could have raised her claims challenging the voluntariness of her guilty plea on direct appeal.  *See Jackson*, 375 F. App'x at 960 (citing *United States v. Hernandez-Fraire*, 208 F.3d 945, 949 (11th Cir. 2000).

*nineteen years* after learning that she would be deported as a result of her guilty plea and twenty years after her conviction. Based on these facts, I recommend that the Court find that, like the petitioner in *Tran*, Louis had other available remedies, but did not avail herself of them and that her efforts now to seek relief through the writ of coram nobis come far too late.

In making this recommendation, I am aware that Louis claims that the recent Supreme Court decision in *Padilla* justifies her otherwise "late" filing of the Petition for Coram Nobis. More specifically, Louis argues that because the Supreme Court issued its decision in *Padilla* in late March of 2010, the filing of her Petition for Coram Nobis in mid-June of 2010 should be considered timely. In essence, Louis's only asserted reason for failing to seek relief earlier is the *Padilla* decision. I respectfully disagree with Louis that *Padilla* meets the requirement for Louis to present a "sound" reason for failing to seek relief earlier. This argument was implicitly rejected by the Southern District of New York in *Chhabra v. United States*, 2010 WL 4455822 (S.D.N.Y. Nov. 3, 2010).

In *Chhabra*, the petitioner was a medical doctor who was born in India and became a United States citizen in 1979. From approximately 1989 through 1998, Chhabra solicited and received monetary kickbacks in return for referring Medicare patients to various medical facilities. Chhabra failed to report the income he received from the kickbacks on his tax returns for numerous years and was charged in June of 1998 with conspiring to receive and receiving kickbacks. *Id.* at *1. Chhabra pled guilty to a two-count criminal information and cooperated fully with the government until his sentencing. *Id.* In late 2002, Chhabra and his attorney met with the probation officer in charge of preparing Chhabra's Pre-Sentence Investigation Report ("PSI"), during which meeting, the probation officer indicated that the conviction made Chhabra potentially deportable. *Id.* at *2. Criminal counsel then referred Chhabra to an immigration law specialist in order to obtain advice regarding

the potential immigration issues prior to sentencing. *Id.* The immigration law specialist was aware that the tax evasion charge was considered to be an aggravated felony and reviewed the guilty plea, advising Chhabra that a guilty plea would make him removable even if his sentence included no incarceration. *Id.*

Subsequently, on February 18, 2003, Chhabra appeared for his sentencing hearing and did not object or move to withdraw his guilty plea. *Id.* The judge imposed a non-custodial term of probation, which Chhabra did not appeal, instead successfully completing his probation. *Id.* In 2006, Chhabra traveled outside the United States. Upon reentry, he was detained by immigration authorities because his conviction appeared in their database. *Id.* Later, in July of 2007, Chhabra was served with a notice to appear in removal proceedings and, in 2008, an immigration judge found that Chhabra was removable. *Id.* Chhabra appealed the immigration judge's ruling to the Board of Immigration Appeals, which ultimately affirmed the ruling in March of 2010. *Id.* In February of 2009, Chhabra filed a petition for writ of error coram nobis, claiming that his original defense counsel was ineffective because, among other things, he incorrectly advised Chhabra that he would not be subject to deportation if he did not receive a prison sentence. *Id.*

In considering Chhabra's petition, the court recognized the stringent standard in a coram nobis petition and noted that when "'reviewing a petition for the writ, a court must presume that the proceedings were correct, and the burden of showing otherwise rests on the petitioner.'" *Id.* at *3 (quoting *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000)). The court ultimately denied the coram nobis petition, finding that Chhabra had failed to demonstrate sound reasons for his six-year delay in seeking appropriate relief. *Id.* In so doing, the court noted that in October of 2002, Chhabra was made aware of potential removal issues resulting from his guilty plea, by the probation

officer preparing the PSI. *Id.* Chhabra, on the advice of his counsel, then retained an immigration specialist in January of 2003, who advised Chhabra that as an aggravated felon, he would be removable from the United States. *Id.* The Court further noted that during this time, Chhabra was actively researching immigration law issues. *Id.*

In view of all of these circumstances, the court found that Chhabra was aware of the potential immigration issues prior to the acceptance of his guilty plea, and despite this knowledge, Chhabra made no attempt to withdraw his plea prior to sentencing. *Id* at *3-4. Additionally, Chhabra never appealed his conviction and instead chose to "fly under the radar" in an attempt to avoid the immigration consequences of his guilty plea. *Id.* at *4. Nor did the court agree that Chhabra's "subsequent strategy of challenging his deportation proceedings first through immigration proceedings and then, only after those efforts failed, . . . challenging the criminal offense underlying his deportation," provided an "adequate reason for delay." In short, the court determined that Chhabra was not entitled to relief through the writ of coram nobis because his petition was untimely.

Significantly, the *Chhabra* Court issued its opinion in November of 2010, more than six months after the Supreme Court released its *Padilla* opinion. Yet the issuance of *Padilla* did not reset the clock and excuse *Chhabra*'s otherwise untimely petition. Additionally, as in *Tran*, *Chhabra* acknowledges that other relief was available to the petitioner in that case even after he entered his guilty plea. And, whereas Chhabra had at least attempted to correct his problems through immigration proceedings, here, Louis did not even do that much. For all of these reasons, Louis's petition is not timely, even in light of *Padilla*. Put simply, *Padilla* does not correct or otherwise render irrelevant Louis's nineteen-year delay in seeking relief that preceded *Padilla*'s issuance.

Nor does *United States v. Hubenig*, 2010 WL 2650625 (E.D. Cal. July 1, 2010), suggest

otherwise.  In *Hubenig*, the court found that the petitioner had asserted valid reasons for not seeking relief prior to the issuance of *Padilla* and did not find the petition to be untimely because the petitioner in that case was not aware of immigration consequences earlier.  The petitioner in *Hubenig* was a Canadian citizen who was living in the United States on March 7, 2003, when he was arrested during a visit to Yosemite National Park for speeding, a traffic control violation, and possession of a controlled substance.  *Id.* at *2.  The petitioner's attorney advised him to plead guilty to all three offenses but did not discuss whether such a plea would affect his immigration status.  *Id.*  After pleading guilty, the petitioner was fined and sentenced to twelve months of unsupervised probation.  *Id.*  In the fall of 2008, deportation proceedings were filed against the petitioner based on his convictions for possession of marijuana.  *Id.*

The petitioner in *Hubenig* asserted that he was unaware of the impact that his 2003 conviction would have on his immigration status until the late fall of 2008, when the deportation proceedings were brought against him.  *Id.* at *3.  He then filed his petition for coram nobis in April of 2010, after originally filing a motion for post-conviction relief.  *Id.*  In finding in favor of the petitioner, the Court determined that the petitioner had asserted a valid reason for not seeking relief earlier – he was not aware of the immigration consequences of his guilty plea until the late fall of 2008.  *Id.*  The Court also noted that the decision relied upon by the petitioner to show that he suffered fundamental error, *Padilla v. Kentucky,* __ U.S. __, 130 S. Ct. 1473 (2010), was decided on March 31, 2010, and the petition was filed within weeks of the *Padilla* decision.

The facts of the instant matter differ substantially from those in *Hubenig*.  In *Hubenig*, the petitioner was unaware of the immigration consequences of his guilty plea until years later.  Once he learned of these consequences, the petitioner sought post-conviction relief before filing his

petition for the writ of coram nobis.   In the instant matter, in contrast, Louis admits that she discovered the immigration consequences of her guilty plea no later than 1991, and yet she took no action whatsoever until she filed the Petition for Coram Nobis in June of 2010 – approximately nineteen years later.   Indeed, on the contrary, through her motion seeking an adjustment to her Sentencing Guidelines level, Louis reaffirmed her guilty plea and her guilt *after* learning for certain that the guilty plea would result in her deportation.   Although the court in *Hubenig* found the petitioner's delay to be excusable because he had not yet discovered that he would be deported, Louis does not enjoy the benefit of any such excuse here.   In addition, while the *Hubenig* Court mentioned that the *Padilla* case on which the petitioner relied came out only weeks before the filing of his petition, the timing of the issuance of *Padilla* did not provide the sole basis upon which the court found that the petitioner had sound reasons for failing to seek relief earlier.

Finally, to the extent that *Hubenig* could be construed broadly as standing for the proposition that a decision in a Supreme Court case can always re-set the time frame for filing for appropriate relief, regardless of a petitioner's prior diligence in seeking relief, I respectfully disagree.   It is not unreasonable to expect a petitioner to bear some responsibility for bringing an allegedly fundamental error to the court's attention or for otherwise seeking relief from the purported error within a reasonable period – or at least one that falls less than nineteen years after the alleged error occurs. *See Jackson*, 375 F. App'x at 960 (finding that petitioner was not entitled to relief where he waited nine years after being released from prison to file petition for writ of error coram nobis and did not present sound reasons for failing to seek relief earlier); *Obasohan*, 318 F. App'x at 800 (failing to investigate and recognize legal significance of claims was not sound reason for failing to seek relief earlier).   "Coram nobis is not a substitute for appeal, and relief under the writ is strictly limited to

those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996).

*B.  Fundamental Error*

Even if Louis had timely filed her Petition and had otherwise qualified for coram nobis relief, her Petition must be denied because she cannot establish fundamental error under *Strickland v. Washington*, 466 U.S. 668 (1984), by showing that she suffered prejudice.  Louis claims that she received ineffective assistance of counsel.  While, generally speaking, ineffective assistance of counsel can constitute a fundamental error that can satisfy this prong of the coram nobis analysis, *see United States v. Esogbue*, 357 F.3d 532, 534 (5th Cir. 2004) (citation omitted); *United States v. Kwan*, 407 F.3d 1005, 1014 (9th Cir. 2005), *abrogated on other grounds by Padilla v. Kentucky*, __ U.S. __, 130 S.Ct. 1473 (2010) ("[petitioner] may satisfy the fundamental error requirement by establishing that he received ineffective assistance of counsel"), Louis cannot succeed on this basis here.

**1.      Strickland Standard for Ineffective Assistance of Counsel**

The legal principles governing a claim of ineffective assistance of counsel are well defined in our jurisprudence.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  Under the test for ineffective assistance of counsel established by *Strickland,* to be successful, a claimant must establish two components: (1) that her attorney's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) that her lawyer's deficient performance prejudiced her defense. *Id.* at 687, 694; *See also Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007),

25

*cert. denied*, 552 U.S. 1043 (2007).

With respect to the first component of the test, judicial scrutiny of counsel's performance is highly deferential, and a fair assessment of that performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.   Indeed, "courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Reed v. Sec'y Fla. Dep't. of Corr.*, 593 F.3d 1217, 1240, *cert. denied*, ___U.S. ___, 131 S. Ct. 177 (2010) (quoting *Strickland*, 466 U.S. at 689.  Put another way, a movant must "establish that no competent counsel would have taken the action that [her] counsel did take." *Hannon v. Sec'y, Dep't of Corr.*, 562 F.3d 1146, 1151 (11th Cir. 2009) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*)).  Moreover, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Reed*, 593 F.3d at 1240 (quoting *Strickland*, 466 U.S. at 690-91). Ultimately, the court must examine "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 687-88.  *see also Hannon*, 562 F.3d at 1151 ("The standard we apply in assessing the first prong is that of a reasonable attorney, not a paragon of the bar").

Next, with respect to the prejudice inquiry, the defendant must show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Hannon*, 218 F.3d at 1151 (quoting *Strickland*, 466 U.S. at 694).

26

Indeed, error by counsel, even if unreasonable, does not warrant setting aside the judgment in a criminal proceeding if counsel's error did not affect the judgment. *Strickland*, 466 U.S. at 691. Overall, a court making the prejudice inquiry must "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.") *Strickland*, 466 U.S. at 695. A court deciding an ineffective-assistance-of-counsel claim need not address both the deficient performance and prejudice prongs of the inquiry if a movant has made an insufficient showing on either prong. *Id*. at 697.

### a.    Deficient Performance

As noted previously, Louis claims that Watts's performance was deficient because he failed to advise her of the immigration consequences of her guilty plea. Louis rests her argument on what she characterizes as a "new rule of law" established by the Supreme Court in *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1486 (2010). On March 31, 2010, the Supreme Court found in *Padilla* that an attorney's performance falls below the objective standard of reasonableness if he fails to advise his client of the potential impact of his client's guilty plea on the client's immigration status. *Padilla*, 130 S. Ct. at 1486.

The parties dispute whether Louis can rely on *Padilla* in challenging Watts's performance. Louis's conviction became final in 1990 when she pled guilty – nearly twenty years before *Padilla* was decided. The Government argues that *Padilla* does not apply retroactively and, thus, *Padilla* cannot support Louis's Petition.

Louis, on the other hand, contends that although the *Padilla* decision itself does not indicate

27

whether it is meant to be applied retroactively, *Teague v. Lane*, 489 U.S. 288 (1989), supports retroactive application of *Padilla*'s holding.  Whether *Padilla* applies retroactively to cases such as the instant one remains an open question.  Indeed, a split of authority exists in the district courts as to whether *Padilla* should apply retroactively.  While some courts have determined that *Padilla* should be applied retroactively, *see, e.g., Hubenig*, 2010 WL 2650625 at *7-8; *United States v. Chaidez*, 2010 WL 3184150 (N.D. Ill. Aug. 11, 2010); *Al Kokabani v. United States,* 2010 WL 3941836 (E.D.N.C. July 20, 2010), other courts have come to the opposite conclusion.  *See, e.g., Gacko v. United States*, 2010 WL 2076020 (E.D.N.Y. May 20, 2010); *United States v. Perez*, 2010 WL 4643033 (Nov. 9, 2010); *United States v. Hernandez-Monreal*, 2010 WL 2400006 (E.D. Va. June 14, 2010).  In this case, however, even if *Padilla* were applied retroactively, Louis would still not be entitled to coram nobis relief because she cannot demonstrate that she suffered any prejudice.  Accordingly, this Court need not decide the issue of retroactivity and will assume, for purposes of this analysis only, that *Padilla* applies retroactively to this case.

>    **b.    Prejudice**

In the specific context of a guilty plea, the first prong of the *Strickland* test remains the same, but "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's own errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Gordon v. United States*, 496 F.3d 1270, 1277 (11th Cir. 2007).  Here, Louis states that she would not have chosen to plead guilty had she known the immigration consequences of her plea.  Instead, Louis claims that she would have risked going to trial.  Louis emphasizes that, after pleading guilty, she was sentenced by Judge Roettger to 63 months in prison and that her Sentencing Guidelines level was 26 with a

range of imprisonment of 63-78 months.  According to Louis, had she proceeded to trial and been convicted, she would have had a Guidelines level of 28 with a range of imprisonment of 70-87 months.  Consequently, Louis contends that conviction upon trial added only a relatively small risk of additional imprisonment.  Had she been acquitted, she would have escaped the prison term and would not have been subject to automatic deportation.  Based on these facts, Louis asserts that it would have been rational for her to reject the plea bargain in this case, had she been advised of the immigration consequences, and a reasonable probability exists that, but for Watts's failure to advise her properly, Louis would not have pled guilty and would have insisted on going to trial.

This Court does not agree that Louis's reasoning satisfies her burden of demonstrating prejudice.  Against the backdrop of the overwhelming evidence of her guilt, as well as the fact that Louis reaffirmed her guilt in her *pro se* Motion for Modification of Sentence even after she knew for certain that she would be deported as a result of her conviction, Louis's self-serving statement twenty years later that she would have gone to trial had she been fully aware of her plea's immigration consequences simply does not suffice to show prejudice.  *See Tahamtani v. Lankford*, 846 F.2d 712, 714 (11th Cir. 1988).  In this case, the Court need not speculate as to what Louis would have done had she known the immigration consequences of her guilty plea because the record shows what she *did* do after she learned that her guilty plea would result in her deportation.

As a preliminary matter, as set forth above, I find that the testimony of Watts was credible and, thus, conclude that Watts did advise Louis that she could be deported as a consequence of pleading guilty.  Nevertheless, even setting aside Watts's testimony and assuming, *arguendo*, that Watts did not advise Louis about the immigration consequences of entering a guilty plea, due to her subsequent actions, Louis cannot meet her burden and show the requisite prejudice under the

29

*Strickland* test.  Pursuant to her own testimony, Louis found out that she would be deported during her prison sentence.  Indeed, as previously discussed, the record reflects that on May 8, 1991, a representative of INS visited Louis at jail and advised her that she would be deported as a result of her conviction.  Similarly, on September 28, 1992, during Louis's prison term, INS ordered that Louis be deported.  In spite of these events, less than three months later, on December 14, 1992, Louis filed a *pro se* Motion for Modification of Sentence pursuant to 18 U.S.C. § 3582(c)(2).  Although, at the time of her *pro se* filing, Louis was aware that her deportation was imminent as a result of her conviction, Louis did not advise the Court that she had been unaware of the immigration consequences of her guilty plea at the time of sentencing, nor did she seek for the Court to vacate her conviction based upon the fact that her guilty plea was not knowingly and voluntarily made. Instead, Louis did precisely the opposite.

In her *pro se* Motion for Modification of Sentence, Louis acknowledged that she had entered a plea of guilty in September of 1990 and was sentenced by the Court to a term of 63 months' imprisonment.  The *pro se* Motion sought to obtain an additional one level-reduction in the Sentencing Guidelines range based upon Louis's cooperation and acceptance of responsibility.  In seeking to obtain this credit, Louis reaffirmed her guilty plea and actually sought to obtain an additional advantage for pleading guilty.  Significantly, the Motion for Modification of Sentence avers that Louis accepted responsibility for her offense, timely provided information concerning her own involvement in the offense, and saved the Government the time and expense of preparing for trial.  Conspicuously absent from Louis's *pro se* Motion is any indication that she would not have pled guilty had she known at the time of the guilty plea, as she did at the time of the *pro se* Motion, that her conviction would result in her deportation.  Because upon learning of the certain

30

immigration consequences of her conviction Louis reaffirmed her guilty plea and did not challenge it as unknowing and involuntary for eighteen years thereafter, she cannot meet her burden of showing that a reasonable probability exists that, but for Watts's alleged failure to advise her properly, she would not have pled guilty and would have instead insisted on going to trial.

Moreover, the strength of the Government's case against Louis weighs against finding prejudice under *Strickland*. The prejudice inquiry in cases where the movant has entered into a guilty plea "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained a trial." *Hill*, 474 U.S. at 59. Accordingly, the question of whether the defendant would have insisted upon going to trial will hinge in large part on whether the defendant might reasonably have achieved a more favorable outcome had she gone to trial. *Id; United States v. Minhas*, 2008 WL 239079 (N.D. Fla. Jan 28, 2008) (citing *United States v. Del Rosario*, 902 F.2d 55, 58 (D.C. Cir.), *cert. denied*, 498 U.S. 942 (1990)).

Louis's contention that she would not have pled guilty had she known the deportation consequences that resulted from the guilty plea is not credible in light of the fact that she faced substantial evidence of her guilt. Even defense attorney Watts conceded on the stand that the Government's case was very strong due to the fact that a confidential informant provided accurate information, cocaine had been found in Louis's own undergarments that she had been wearing, and co-defendant Tulley essentially admitted all of the co-defendants' participation in the crime. Significantly, nowhere in Louis's Petition does she argue that she had viable defenses to the charges brought against her or that she did not commit the crime charged. Additionally, no evidence in the record or presented by Louis suggests that had she gone to trial, Louis would have been acquitted. Instead, Louis relies simply upon naked assertions that she might have been acquitted. Quite simply,

this is not enough.

Moreover, even though Louis faced a maximum of two more years in prison under the Sentencing Guidelines had she proceeded to trial, she still would have been deported if convicted. *See Park v. United States*, 222 F. App'x 82 (2d Cir. 2007) (even if defendant had been aware of the immigration consequences of his plea, he would nonetheless have been faced with the strong likelihood of conviction at trial and such a conviction would trigger the same deportation consequences and would probably result in a longer sentence). Louis has the burden of showing that persistence in a not-guilty plea was an attractive option. *Minhas*, 2008 WL 239079 at *14. Here, she has not done so. Because Louis cannot carry her burden of demonstrating that she was prejudiced by any alleged deficient performance by attorney Watts, I recommend that her Petition for Writ of Error Coram Nobis be denied.

### III.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, Petitioner has not set forth sound reasons for failing to seek relief earlier and has not carried her burden of showing that she was prejudiced by an alleged ineffective assistance of counsel. Therefore, I respectfully **RECOMMEND** that Petitioner Marie Louis's Petition for Writ of Error Coram Nobis to Vacate or Set Aside a Conviction [D.E. 1] be **DENIED**.

The parties shall have fourteen (14) days from the date of being served with a copy of the Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge. 28 U.S.C. § 636(b)(1). Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Resolution*

*Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982)(en banc).[9]

      **DONE AND ORDERED** at Fort Lauderdale, Florida, this 2nd day of February, 2011.

 

                                        ROBIN S. ROSENBAUM
                                        UNITED STATES MAGISTRATE JUDGE

cc:    Hon. William J. Zloch
       Counsel of Record

---

[9] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

33